**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **WILLIAM RIVERA,** | : | **CIVIL ACTION** |
| **Petitioner,** | : | |
| | : | |
| **v.** | : | **No.: 19-cv-1155** |
| | : | |
| **JOHN E. WETZEL, et al.,** | : | |
| **Respondents.** | : | |

**MEMORANDUM OPINION**

**LYNNE A. SITARSKI**
**UNITED STATES MAGISTRATE JUDGE** **September 25, 2026**

Presently pending before this Court is Petitioner's Statement of Claims and Discovery Requests (ECF No. 72), Respondents' Response to Discovery Requests (ECF No. 79), and Petitioner's Reply to the Commonwealth's Response to the Discovery Requests (ECF No. 80). For the following reasons, Petitioner's requests are **GRANTED in part** and **DENIED in part**.

## I. FACTUAL AND PROCEDURAL BACKGROUND[1]

This case stems from the September 25, 1995, murder of Tae Hun Kang. That evening, Mr. Kang and his wife closed their jewelry store and got into their car to drive their usual route home, with Mr. Kang behind the wheel. (Penalty Phase Resp., ECF No. 57, at 3-4 (quoting *Commonwealth v. Rivera*, 773 A.2d 131, 135 (Pa. 2001))). Petitioner and his accomplices observed the Kangs as they departed and noticed that Mr. Kang was carrying a manila envelope that they believed contained cash. (*Id.* at 3 (quoting *Rivera*, 773 A.2d at 135)). While they were stopped at a red light, Mrs. Kang heard glass shattering, followed by a voice commanding her

[1] Because the Court writes primarily for the benefit of the parties, the Court recites only those facts pertinent to the resolution of the instant motion.

husband to get out of the car. (*Id.* at 4 (quoting *Rivera*, 773 A.2d at 135-36)). She then saw a gun being pointed at her husband through the broken car window. (*Id.* (quoting *Rivera*, 773 A.2d at 136)). Mr. Kang was then shot four times—once in the hand and thrice in the chest—injuries to which he succumbed later that evening. (*Id.* (quoting *Rivera*, 773 A.2d at 136); Stmt., ECF No. 72, at 9 (citing Autopsy, ECF No. 14, at 60-63)). The precise circumstances surrounding Mr. Kang's shooting are disputed by the parties. Petitioner admitted to breaking the car window and shooting Mr. Kang but contends that the gun went off as the two men were outside of the car, struggling for control of the weapon. (Stmt., ECF No. 72, at 10 (citing Phila. Police Dep't (PPD) Interview Notes, ECF No. 14, at 25) (noting that Petitioner told police that "while he was pulling Mr. Kang out of the car," Mr. Kang "tried to take the gun away" from Petitioner, who was "scared because he was weak from a recent surgical operation"); *see also* Penalty Phase Resp., ECF No. 57, at 4 (quoting *Rivera*, 773 A.2d at 136) (noting that Petitioner "insisted . . . that the gun accidentally fired while he was struggling with Mr. Kang" when questioned by police)). Respondents, by contrast, assert that Mr. Kang was shot twice while he was in the car before being dragged out and in front of the vehicle, where he was shot two more times. (Penalty Phase Resp., ECF No. 57, at 4 (quoting *Rivera*, 773 A.2d at 136)).

Petitioner's trial took place in late January and early February 1998. (Ct. Crier Trial Notes, ECF No. 14-3, at 1141). On February 4, 1998, a jury convicted him of first-degree murder and related offenses, and two days later it returned a sentence of death. (Hab. Pet., ECF No. 13, at 2).

At trial, the location and circumstances of Mr. Kang's shooting became key to the central issue of whether Petitioner possessed the *mens rea* to have committed first-degree murder. (Stmt., ECF No. 72, at 10-11). The prosecution argued that Petitioner had the requisite intent because he shot Mr. Kang at least twice while he was sitting helplessly in the driver's seat of his

car, while the defense argued that all the shots occurred while the two men struggled outside of the car. (*Id.* at 11). The parties agreed that the only forensic evidence obtained from the Kangs' car was fingerprints. (*Id.*). The defense used this fact to support its theory of the case, arguing that the lack of evidence such as gunpowder burns or bullets recovered from the car suggested that the shooting happened outside of the vehicle. (*Id.*). The prosecution countered that the lack of evidence in the car was a result of it being contained by Mr. Kang's clothing. (*Id.* at 11-12). Mr. Kang's clothing was not introduced in court, however, as Officer Avon Wilson, the PPD officer who collected it, testified that "[i]t was bloodstained and wet" and therefore unsafe to present to the jury. (*Id.* at 12; *see also id.* at 9).

Also at trial, Dr. Ian Hood of the Philadelphia Medical Examiner's Office (OME) testified about Mr. Kang's autopsy, even though Dr. Greg McDonald performed it, because Dr. McDonald was purportedly unavailable. (*Id.* at 9, 12). Petitioner states that Dr. Hood's testimony deviated from and speculated beyond the autopsy report, but that this testimony went unchallenged and that neither Dr. McDonald nor another pathologist was called to testify. (*Id.* at 12-13).

Turning to the instant discovery disputes, this Court directed that Petitioner submit a statement identifying the claims and materials he is pursuing in this habeas action. (Order, ECF No. 65). Accordingly, Petitioner filed his statement on December 15, 2025. (Stmt., ECF No. 72, at 1). In his statement, he seeks leave to serve four subpoenas, directed to: (1) the Pennsylvania Board of Continuing Legal Education (CLE) for the trial prosecutor's CLE records; (2) the PPD crime lab for a variety of records from the investigation in this case; (3) the PPD crime lab for its procedures regarding the collection and storage of evidence; and (4) the OME for notes and correspondence between it and the Philadelphia District Attorney's Office (DAO) regarding trial preparation in this case, as well as OME policies from the time of Petitioner's trial regarding the

process for determining the testifying medical examiner. (*Id.* at 2). Petitioner indicated that Respondents do not oppose the second subpoena but do oppose the first, third, and fourth ones. (*Id.*).

This Court directed Respondents to file a response to Petitioner's statement, which they did on July 22, 2026. (Order, ECF No. 78; Disc. Resp., ECF No. 79, at 2). They noted that Petitioner's fourth request is actually two distinct requests: one for OME-DAO "notes, correspondence, and attempted correspondence" about preparation for Petitioner's trial (designated request (4)(a)) and one for policies regarding the testifying medical examiner selection process (designated request (4)(b)). (Disc. Resp., ECF No. 79, at 2 & n.2 (quoting Stmt., ECF No. 72, at 27)). Respondents further clarified that they opposed (4)(b) but not (4)(a). (*Id.* at 2).

Petitioner filed a reply to Respondents' response on July 29, 2026. (Reply, ECF No. 80, at 1).

## II. LEGAL STANDARD

Habeas petitioners are not entitled to discovery as a matter of ordinary course. *Bracy v. Gramley*, 520 U.S. 899, 904 (1997). Instead, discovery in habeas matters follows Rule 6(a) of the Rules Governing § 2254 Proceedings, which states that "for good cause" a court may permit a party to conduct discovery pursuant to the Federal Rules of Criminal or Civil Procedure. Rule 6(a); *see also Bracy*, 520 U.S. at 904 (a habeas petitioner "shall be entitled to invoke the processes of discovery available . . . if, and to the extent that, the judge in the exercise of his discretion and for good cause shown grants leave to do so"). "Good cause" is demonstrated "where specific allegations before the court show reason to believe that the petitioner may, if the facts are more fully developed, be able to demonstrate that he is . . . entitled to relief." *Bracy*,

520 U.S. at 908-09 (quoting *Harris v. Nelson*, 394 U.S. 286, 300 (1969)). Thus, to establish "good cause" a petitioner must identify specific, discoverable evidence to support a constitutional claim. *U.S. ex rel. Adonai-Adoni v. Prison Health Servs.*, No. 06-4491, 2007 WL 2407281, at *1 (E.D. Pa. Aug. 20, 2007) (citation omitted); *see also Randolph v. Beard*, No. 06-0901, 2014 WL 6065887, at *3 (M.D. Pa. Nov. 13, 2014) ("Petitioner need not show that the additional discovery would definitely lead to relief. Rather, he need only show good cause that the evidence sought would lead to relevant evidence regarding his petition." (citation omitted)). However, such "speculative discovery requests" as may "amount[] to an entreaty to engage in a fishing expedition . . . should be rejected." *Williams v. Beard*, 637 F.3d 195, 210-11 (3d Cir. 2011).

## III. DISCUSSION

With these facts and legal standards in mind, the Court now analyzes each of Petitioner's subpoena requests in turn.

### A. Request (1) to the Pennsylvania CLE Board for the Prosecutor's CLE Records

Petitioner's first request is for leave to subpoena the Pennsylvania CLE Board records of trial prosecutor Assistant District Attorney (ADA) Ann Ponterio in support of his *Batson* claim.[2] (Stmt., ECF No. 72, at 3). Noting that under *Miller-El v. Cockrell* "[t]raining is 'relevant to the

[2] In *Batson v. Kentucky*, the Supreme Court held that the Equal Protection Clause prohibits a prosecutor from exercising his peremptory challenges to strike potential jurors solely based on their race. 476 U.S. 79, 89 (1986). *Batson* established a three-step burden-shifting test to determine if the peremptory striking of jurors was unconstitutional: (1) the defendant must establish a *prima facie* case of discrimination; (2) the prosecution must offer a race-neutral explanation for its peremptory strikes; and (3) the defendant must prove that the prosecution's explanation was pretextual. *Miller-El v. Dretke*, 545 U.S. 231, 267 (2005).

extent it casts doubt on the legitimacy of the motives underlying the State's actions in petitioner's case,'" he argues that these records will show that Ponterio "appears to have employed race- and gender-based stereotypes" advanced in DAO and potentially other trainings when, during jury selection for his trial, "she struck Black women and Black jurors from low-income neighborhoods but accepted an older Black male juror from the South." (*Id.* at 4-5 (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 347 (2003))).

Respondents oppose Petitioner's request, arguing lack of good cause to subpoena Ponterio's CLE records for two reasons. (Disc. Resp., ECF No. 79, at 4). First, they point out that while the CLE records could provide general information about Ponterio's training, they cannot establish that in this case she acted therewith or with the required mental state. (*Id.*). Second, Respondents observe that the sessions in question were internal DAO trainings rather than CLE courses, and thus the CLE board would not have records reflecting whether Ponterio attended them. (*Id.*). Furthermore, Respondents note that even if the CLE board has records of which trainings Ponterio attended nearly four decades ago, it is unlikely that they will reflect the necessary details to support Petitioner's claim from these long-past sessions. (*Id.* at 4-5).

In addition to reiterating arguments from his initial filing, Petitioner replies that Respondents "ignore[] Petitioner's entire request" because he also seeks "records confirming that ADA Ponterio attended . . . any 'other trainings at which discriminatory voir dire practices were advanced.'" (Reply, ECF No. 80, at 2-3 (quoting Stmt., ECF No. 72, at 5)).

Respondents are correct that it is doubtful that any such records contain the evidence Petitioner seeks. First, the internal, intraoffice nature of these sessions that explicitly advocated for prosecutors to engage in unconstitutional, racially discriminatory conduct makes it unlikely that they were offered for CLE credit and thus recorded by the CLE board. (*See* Disc. Resp., ECF No. 79, at 4). And even if the board did record the fact that the trainings occurred, it is

improbable that nearly 40 years ago (prior to the widespread use of email or other electronic methods for sharing or preserving documents) the board would have collected materials from the training, and yet still more implausible that the presenters would have recorded their directives to engage in such explicitly unconstitutional actions in documents to be shared with it. (*See id.* at 4-5). Thus, the unlikely probability that the board has the records Petitioner seeks—or, on the off chance that it does, that the records contain the information Petitioner believes they do—is outweighed by the burden the request would place upon the non-party CLE board to search for and then pore over decades-olds documents for information it very likely does not possess. *First Sealord Sur. v. Durkin & Devries Ins. Agency*, 918 F. Supp. 2d 362, 383 (E.D. Pa. 2013) (noting that in evaluating a subpoena, "discovery is not allowed . . . where compliance is unduly burdensome" (quoting *Mannington Mills, Inc. v. Armstrong World Indus., Inc.*, 206 F.R.D. 525, 529 (D. Del. 2002))).

Petitioner also lacks good cause for his request for "any 'other trainings [Ponterio attended] at which discriminatory voir dire practices were advanced.'" (Reply, ECF No. 80, at 3 (quoting Stmt., ECF No. 72, at 5)). He argues that these records are relevant to his claim "because her conduct . . . was consistent with the practices taught" in the aforementioned DAO training sessions. (Stmt., ECF No. 72, at 5). However, evidence that she attended other trainings would be unlikely to shed much light on whether her conduct conformed to the specific methods taught in the two particular DAO trainings Petitioner identified here. As such, the records sought by Petitioner would not sufficiently support his "*specific allegations* before the court" to warrant "good cause" for their production, *Bracy*, 520 U.S. at 908-09 (emphasis added).

Moreover, this request is even more unduly onerous to the CLE board. First, as with the DAO trainings, it is improbable that any other CLEs with materials instructing attorneys to use clearly unconstitutional methods would have been provided to the CLE board either. And even

if they were provided, the broad nature of the request stands in contrast to Petitioner's previous request, which is at least tailored to specific training. Here, Petitioner provides the board with no guidance on how it should identify which training advocated discriminatory jury selection processes, instead tasking it with devising and deploying its own subjective standards while perusing a career's worth of professional education records. *See Ponterio, Ann*, DISCIPLINARY BD. OF THE S. CT. OF PA., https://www.padisciplinaryboard.org/for-the-public/find-attorney/attorney-detail/41347 (showing that Ponterio has been an active member of the Pennsylvania bar since 1984). The nebulous nature of this request "amounts to an entreaty to engage in a fishing expedition. The law is clear, however, that such speculative discovery requests should be rejected." *Williams*, 637 F.3d at 210-11.

For these reasons, Petitioner's first request is denied for lack of good cause.[3]

**B. Request (2) to the PPD Crime Lab for Materials Relating to PPD's Investigation**

Respondents do not oppose Petitioner's second request for PPD crime lab materials pertaining to the police investigation. (Disc. Resp., ECF No. 79, at 2). The request is therefore granted.

[3] Although the Court denies Petitioner's request, he remains free to use the acknowledged fact that the DAO held the aforementioned unconstitutional, discriminatory trainings, (*see* Disc. Resp., ECF No. 79, at 4), as evidence that may bear on his *Batson* claim. As *Miller-El* further holds, the very fact that "prosecutors joined the District Attorney's Office when assistant district attorneys received formal training in excluding minorities from juries" suffices to conclude they were at minimum "likely not ignorant" of their office's "culture of discrimination," leading to a "supposition that race was a factor" in jury selection, which could be corroborated with material evidence such as prosecutors' voir dire notes. 537 U.S. at 347. As Respondents themselves admit, it is sufficient "[t]o make [Petitioner]'s point" for him to show that the DAO held trainings for prosecutors instructing them on the use of race-based voir dire practices during Ponterio's tenure. (Disc. Resp., ECF No. 79, at 5).

### C. Request (3) to the PPD Crime Lab for Evidence Collection and Storage Procedures

Petitioner's third request is for leave to subpoena the PPD crime lab for its procedures regarding the collection and storage of trial evidence in effect at times pertinent to his case. (Stmt., ECF No. 72, at 25). He argues these procedures may support his claims under *Youngblood*,[4] *Napue*,[5] and *Brady*,[6] as well as for ineffective assistance of counsel.[7] (*Id.* at 25-26). Regarding *Youngblood*, Petitioner argues that the PPD's failure to adhere to its own policies regarding evidence collection and storage would support his claim that it did not properly "retain and . . . preserve all material that might be of conceivable evidentiary significance" where the victim's "upper body clothing"—consisting of an undershirt, a short-sleeved shirt, and a jacket (*id.* at 16)—was stored in a manner that made forensic testing impossible and may have

---

[4] In *Arizona v. Youngblood*, the Supreme Court held that a defendant establishes a violation of their Fourteenth Amendment due process rights where he or she can show that police acted in bad faith in failing to preserve potentially exculpatory evidence. 488 U.S. 51, 57-58 (1988).

[5] In *Napue v. Illinois*, the Supreme Court held that a conviction obtained through the State's knowing use of false evidence, or through the State's failure to correct unsolicited false testimony, violates the Fourteenth Amendment. 360 U.S. 264, 269 (1959).

[6] In *Brady v. Maryland*, the Supreme Court held that the suppression of evidence favorable to a criminal defendant violates due process. 373 U.S. 83, 87 (1963). Under *Brady*, a defendant must establish three essential elements: (1) the evidence has exculpatory or impeachment value to the accused; (2) the evidence was either willfully or inadvertently suppressed; and (3) the defendant was prejudiced because the evidence was "material." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). The Court has subsequently clarified that *Brady* establishes an affirmative duty for the State to disclose such evidence. *Id.* at 280 (citing *United States v. Agurs*, 427 U.S. 97, 107 (1976)).

[7] In *Strickland v. Washington*, the Supreme Court held that in order to successfully make a claim of ineffective assistance of counsel, a criminal defendant must show that their attorney's counsel was so deficient as to fall below the objective standard of reasonableness guaranteed under the Sixth Amendment and that this deficient performance was prejudicial to the defense. 466 U.S. 668. 687-88 (1984). A showing of prejudice requires that the attorney erred such that the defendant was deprived of a fair trial with reliable results. *Id.*

destroyed gunshot residue or other beneficial forensic evidence. (*Id.* at 25-26 (quoting *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988))). Turning to *Napue*, he posits that an experienced homicide prosecutor like Ponterio "should have known that standard police procedure called for the drying of wet evidence before storage" and that Wilson's testimony that he opted not to bring the victim's clothing to court "because 'it wouldn't be healthy'" given its bloody, still-wet state was false. (*Id.* at 26). Petitioner submits that "concealing from the jury the blood-soaked state of the clothing" by failing to produce it in court also implicates *Brady* because the clothing's condition constitutes "withheld material, exculpatory evidence . . . that would have supported trial counsel's theory of a struggle outside the vehicle."[8] (*Id.* at 21-22). Finally, Petitioner theorizes that the crime lab procedures may support his ineffectiveness claim because they could have been used by his trial counsel to impeach Wilson regarding his stated reasons for not bringing the clothing to court, insofar as they were inconsistent with those procedures, and to form the basis of a request for an independent examination of the evidence. (*Id.* at 26). Petitioner argues that achieving either or both goals would have resulted in "a reasonable probability" that the jury would have rejected the prosecution's theory of the shooting. (*Id.* (citing *Strickland v. Washington*, 466 U.S. 668, 694 (1984))).

---

[8] Specifically, Petitioner argues that the fact that no forensic evidence of a struggle—and specifically no blood—was found in the Kangs' car, contrasted with how bloody Mr. Kang's shirt was, would show that the shooting must have taken place outside the vehicle. (*See* Stmt., ECF No. 72, at 10-12, 22 n.10 (arguing that "Wilson's . . . false testimony deprived the jury an opportunity to see that the decedent's clothes were simply sopping with blood, which would have established the false nature of the prosecution's argument that there was no forensic evidence, including blood, in the car because Mr. Kang had been clothed" (citations omitted)); Reply, ECF No. 80, at 3 ("[G]iven that no blood was found in the car, the more blood-soaked the clothes were, the less likely it was that Mr. Kang was shot in the car.")). As noted *supra* at 2-3, whether the shooting occurred in or out of the car became a central fact at trial in relation to whether the shooting was part of a struggle between Petitioner and Mr. Kang and, therefore, whether Petitioner lacked the requisite *mens rea* for first-degree murder.

Respondents oppose Petitioner's request, again arguing lack of good cause. (Disc. Resp., ECF No. 79, at 6). They point out that Petitioner has not provided a consistent theory regarding "how the shirt *was* stored, or what evidence it does or does not contain" to establish a *Youngblood* claim. (*Id.* at 7 (emphasis in original)). As for the *Napue* claim, they note that Wilson did not testify about whether the crime lab "properly followed its internal policies for preserving the shirt" but instead only related that it "was bloody, wet, and therefore unhealthy." (*Id.*). Thus, Respondents assert that Ponterio could not have failed to correct Wilson on a topic about which he never testified. (*Id.*). Finally, regarding Petitioner's *Brady* claim, Respondents observe that it is unfathomable that describing the shirt as "bloodstained and wet" somehow conceals that it was "blood-soaked." (*Id.*).

Petitioner replies that Respondents improperly downplay the significance of the condition of the victim's shirt, claiming that it speaks both to where the shooting occurred ("the more blood-soaked the clothes were, the less likely it was that Mr. Kang was shot in his car") and the relative locations of the parties involved in the shooting ("Any results of gunshot residue testing of the clothing would have been helpful in assessing Petitioner's proximity to Mr. Kang when Mr. Kang was shot."). (Reply, ECF No. 80, at 3). In reference to his *Youngblood* claim, Petitioner argues that storing the victim's clothing "balled up in the same plastic bag," likely in contravention of the PPD crime lab's own collection and preservation policies, would have "largely destroyed any additional evidentiary value" the clothes may have had, including the opportunity for an "analysis of the blood or possible gunshot residue patterns." (*Id.* at 6). Regarding his *Brady* and *Napue* claims, he postulates that "'bloodstained and wet' and 'blood-soaked' are not the same thing" because "[b]loodstains come in all shapes and sizes, and the trial record was clear that the clothing could have been 'wet,' not from being 'blood-soaked,' but from the rain." (*Id.* at 4 (citations omitted)). Petitioner also argues that failing to produce the

shirt in court due to health concerns disregards "the reality of criminal homicide trials," where evidence that is "bloodstained and wet," at least "at the time of its collection," is frequently presented to juries. (*Id.*).

Respondents are correct that Petitioner has failed to advance good cause to grant this request. First, although Petitioner has provided information that could partially support a claim under *Youngblood* that the evidence in question was not stored in compliance with procedure, resulting in the inability to perform additional forensic testing, (Stmt., ECF No. 72, at 25-26 (quoting *Youngblood*, 488 at 58)), this showing alone is insufficient because *Youngblood* further "hold[s] that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." 488 U.S. at 58. Thus, if Petitioner cannot show that the improper storage of the shirt resulted from bad faith—something that he utterly fails to develop here—then this failure cannot form the basis of a *Youngblood* claim. (*See* Stmt., ECF No. 72, at 25-26 (explaining that the crime lab's failure to adhere to its own policies would bolster his theory that the police did not "adequately 'retain and to preserve all material that might be of conceivable evidentiary significance,' *Youngblood*, 488 U.S. at 58," but not how the failure to preserve the evidence or follow policies signifies bad faith); *see also* Reply, ECF No. 80, at 4 (responding solely to Respondents' assertion that Petitioner has offered inconsistent theories in support of his *Youngblood* claim, but again not asserting bad faith)).

Second, in support of his *Napue* claim, Petitioner posits that when Wilson testified that he could not produce the shirt in court "because it was a health hazard," Ponterio had a duty to correct him because she should have known that normal police procedures require that wet evidence be dried prior to storage. (Stmt., ECF No. 72, at 26). Respondents correctly point out, however, that Wilson in fact never addressed whether the PPD crime lab followed its internal

procedures for handling and maintaining the shirt, only "that the shirt was bloody, wet, and therefore unhealthy." (Disc. Resp., ECF No. 79, at 7). Thus, regardless of whether Wilson's statement was "common sense," as Respondents maintain, (*id.*), or "ignores the reality of criminal homicide trials," as Petitioner counters, (Reply, ECF No. 80, at 4), the bottom line for *Napue* is that it did not constitute a misrepresentation about either the evidence itself or PPD's collection and retention policies. As Respondents observe, Ponterio could not have failed to correct Officer Wilson on a topic about which he was silent, (Disc. Resp., ECF No. 79, at 7), and thus the prosecution did "not knowingly use false evidence, including false testimony, to obtain a tainted conviction." *Napue v. Illinois*, 360 U.S. 264, 269 (1959).

Nor could this testimony have been fabricated to hide from jurors the "blood-soaked" condition of the shirt, since "bloodstained and wet" communicates substantially the same meaning. It is clear from the context of Wilson's characterization that his reference to the shirt being wet and unhealthy implies blood rather than rainwater, which is commonly viewed as far less unhygienic than blood. In any event, the pertinent point for the jury to consider was that no blood (or other forensic evidence) was found in the car—a point that Petitioner himself repeatedly emphasizes. (*See, e.g.*, Stmt., ECF No. 72, at 17; Reply., ECF No. 80, at 3-4 (citations omitted)). Because there was no blood in the car, any significant amount of blood on the shirt—even if only "bloodstained"—would still have sufficed to support Petitioner's theory that the gun was discharged during a struggle outside the vehicle, leaving the distinction between "blood-soaked" and "bloodstained" (if any) as one without a material difference. *See Brady*, 373 U.S. at 87 (holding that suppressed evidence must be material to guilt or punishment to support a claim). In other words, there is simply no basis to believe that that the jury may have reached a different conclusion if they had evidence that Mr. Kang's clothes were "blood-soaked" rather than "bloodstained." *See id.*

Finally, Petitioner theorizes that the requested discovery could support his ineffective assistance of counsel claim because if he could have shown the jury that the shirt had not been properly preserved or that Wilson had testified falsely, a reasonable probability exists that the jury would have reached a different conclusion. (Stmt., ECF No. 72, at 26 (citing *Strickland*, 466 U.S. at 694)).

Under *Strickland*, "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." 466 U.S. at 686. This requires a two-part showing. First, a defendant must show that counsel's performance was so deficient as to fall below an objective standard of reasonableness. *Id.* at 687-88. Then, the defendant must show that their counsel's objectively unreasonable performance was prejudicial to the outcome of the trial, i.e. that there is a "reasonable probability" that the result would have been different but for counsel's deficiency. *Id.* at 687, 694.

Here, however, Petitioner presents his claim of ineffectiveness as a purely conclusory assertion, merely stating that had his trial counsel used the PPD policies to show that evidence was improperly preserved and/or that Wilson testified falsely, "there is a reasonable probability the jury would have rejected the prosecution's narrative of how the crime occurred." (Stmt., ECF No. 72, at 26 (citing *Strickland*, 466 U.S. at 694)). Petitioner fails to explain how these purported failures by his trial counsel were objectively unreasonable or how, without them, a reasonable probability exists that the outcome of his trial would have been different. Because Petitioner merely provided a conclusory assertion with a passing citation to *Strickland* and no explanation of the connection between the two, this Court is left to speculate, and "such speculative discovery requests should be rejected." *Williams* 637 F.3d at 210-11.

Because the discovery at issue in Petitioner's third request would not help him make out any of his habeas claims, the request is denied for lack of good cause.

**D. Request (4) to the OME and DAO for Notes, Correspondence, and Policies**

As noted by Respondents, Petitioner's fourth request comprises two distinct requests: one for OME-DAO "notes, correspondence, and attempted correspondence" regarding Petitioner's trial (request 4(a)), and the other for the agencies' policies regarding selecting which medical examiner will testify at a trial as were in effect from the date of Mr. Kang's September 25, 1995 homicide through the conclusion of Petitioner's trial on February 6, 1998 (request 4(b)). (Disc. Resp., ECF No. 79, at 2; Stmt., ECF No. 72, at 25). The Court grants Petitioner's request 4(a) as unopposed and turns its attention to request 4(b).

In request 4(b), Petitioner seeks policies regarding the process for choosing the testifying medical examiner, including how to respond to a trial defense subpoena issued to an examiner, in support of his *Napue*, *Brady*, and ineffectiveness claims. (Stmt., ECF No. 72, at 27). Specifically, Petitioner argues that Ponterio relied on Dr. Hood's testimony at trial that Mr. Kang was shot twice while in his car without leaving bloodstains in the vehicle to formulate her theory of the case and, particularly, her argument regarding specific intent, (*see id.* at 19-20 (citing Arden Addendum, ECF No. 72-1, at 100), 28; *see also* Arden Consultation, ECF No. 72-1, at 96 (noting that Dr. Hood testified that blood remained in Mr. Kang's chest cavities at autopsy when the autopsy report made no such mention)), but that the non-testifying medical examiner, Dr. McDonald, who actually conducted the autopsy, would have testified that Mr. Kang's injuries were consistent with a struggle over the gun and that it was impossible for any expert to opine to a reasonable degree of certainty that the shooting occurred inside the vehicle. (Stmt., ECF No. 72, at 28 (citing Dr. McDonald Decl., ECF No. 14, at 98)). Accordingly, Petitioner submits that he can establish his *Napue* and *Brady* claims if Ponterio presented Dr. Hood's testimony instead

of Dr. McDonald's in contravention of established OME policies or because she believed he would testify more consistently with her case theory. (*Id.* at 28-29). Petitioner also asserts that the policies regarding responding to trial subpoenas may support his ineffectiveness claim because they would tend to demonstrate that counsel could have called Dr. McDonald as a defense witness at trial, even though Dr. Hood testified he was not "present in the office" on the day of trial. (*Id.* at 29 (quoting N.T. 1/30/98 at 78)).

Respondents oppose Petitioner's request for policies on the grounds that a failure to follow a local medical examiner's office's internal guidelines does not establish a constitutional violation and, as to the *Napue* claim specifically, Petitioner has not alleged that Ponterio failed to correct any misstatement about the OME's usual practices. (Disc. Resp., ECF No. 79, at 9).

Petitioner is correct that evidence of Ponterio's role in violating these policies or even knowledge that they were being violated by others could support his *Napue* claim that she knowingly permitted Dr. Hood to testify falsely. (*See* Reply, ECF No. 80, at 6). Specifically, if evidence substantiates Petitioner's allegation that the choice of Dr. Hood to testify in lieu of Dr. McDonald was knowingly made in contrary to policy, it could tend to support his claim that this choice was made to deliberately elicit false testimony from Dr. Hood rather than in accordance with standard procedure. Although Respondents are correct that violating local policies does not itself inherently run afoul of the Constitution, that is not the standard for a finding of good cause. Rather, "good cause" has been established where a petitioner can "point to specific evidence that might be discovered that would *support* a constitutional claim." *Adonai-Adoni*, 2007 WL 2407281, at *1 (emphasis added) (citation omitted). Here, Petitioner has identified specific, discoverable evidence that could support the theory under *Napue* that policies were disregarded so that Ponterio could knowingly present Dr. Hood's false testimony or, at a minimum, permit such testimony to go uncorrected to obtain Petitioner's conviction—to the extent it still exists

within OME's possession, three decades later. (Stmt., ECF No. 72, at 28-29); *Adonai-Adoni*, 2007 WL 2407281, at *1; *Napue*, 360 U.S. at 269. Likewise, should the requested evidence still be accessible by OME and support Petitioner's *Napue* theory that Ponterio knowingly elicited false testimony by putting Dr. Hood on the stand instead of Dr. McDonald, it would also establish a *Brady* violation because doing so would naturally have suppressed Dr. McDonald's favorable testimony. (Stmt., ECF No. 72, at 28-29); *Brady*, 373 U.S. at 87. Finally, it also follows that if any OME policies from the relevant period can be produced regarding how to respond to a defense subpoena for the trial attendance of a specific medical examiner existed, they could potentially support Petitioner's claim that his trial counsel was ineffective in failing to secure evidence that substituting Dr. Hood for Dr. McDonald violated then-established policy. (Stmt., ECF No. 72, at 29; Reply, ECF No. 80, at 7).

Petitioner's request 4(b) is granted for good cause.

## IV. CONCLUSION

For the foregoing reasons, Petitioner's motion is granted in part and denied in part. An appropriate order follows.

BY THE COURT:

/s/ Lynne A. Sitarski
LYNNE A. SITARSKI
United States Magistrate Judge